* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Hall and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Hall.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS *Page 2 
1. The date of the alleged injury or occupational disease that is the subject of this claim is March 28, 2007. However, in the event that Plaintiff's medical condition is deemed to be an occupational disease, the first date on which Plaintiff (1) was diagnosed by competent medical authority and (2) was disabled may be different.
2. At all relevant times, the parties hereto were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
3. At all relevant times, Defendant-Employer regularly employed three (3) or more employees in the State of North Carolina.
4. At all relevant times, the carrier of workers' compensation insurance in North Carolina for the Defendant-Employer was Defendant-Carrier Phoenix Insurance Company.
5. Plaintiff's average weekly wage is $1,038.31, resulting in a compensation rate of $692.20 for purposes of total disability.
6. The North Carolina Industrial Commission has jurisdiction over the subject matter and the parties involved in this case.
7. Since March 9, 1987, Plaintiff has worked for Defendant-Employer as a Sheeter Operator, Heat Seal Operator, Pre-Gluer, and Lift Truck Operator. Written descriptions of these jobs are contained in the stipulated exhibits.
8. Plaintiff last worked for Defendant-Employer on or about February 28, 2007. Plaintiff was placed on medical leave of absence effective March 1, 2007.
9. Plaintiff applied for and received benefits from a union disability plan that was employer funded, but purchased and administered by the union.
10. If compensation is payable in this claim, Defendants are entitled to a credit under N.C. Gen. Stat. § 97-42 in the amount of $4,731.83, representing 75% of the $6,309.10 in non-workers' *Page 3 
compensation disability benefits to paid to Plaintiff. However, Defendants shall indemnify and hold Plaintiff harmless against all attempts, if any, by the plan to seek reimbursement for these disability benefits.
11. Plaintiff's issues for hearing:
 a. Whether Plaintiff's injury is a compensable injury or occupational disease?
 b. Whether Defendants are liable for Plaintiff's medical condition?
 c. Whether Plaintiff has been disabled by his medical condition?
 d. Whether Plaintiff is entitled to medical compensation and/or indemnity compensation and, if so, how much?
12. Defendants' issues for hearing:
 a. Whether Plaintiff suffered an injury by accident or occupational disease?
 b. Whether Plaintiff's claim is barred by N.C. Gen. Stat. § 97-22?
 c. Whether Defendants are entitled to a credit for benefits paid by the union's short-term or long-term disability plans or any other plans?
 d. Whether Plaintiff is estopped from asserting a workers' compensation claim based upon his prior representations that his injury was not work-related?
 * * * * * * * * * * *
The following were submitted before Deputy Commissioner Hall as:
 EXHIBITS
1. Stipulated Exhibit 1 — I.C. forms, medical records, discovery documents, collective bargaining agreement, recorded statement, and medical bills. *Page 4 
 * * * * * * * * * * *
Based upon all of the competent credible evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 66 years old at the time of the hearing before the Deputy Commissioner and has been a U.S. citizen since 1990. Plaintiff emigrated from Cambodia where he completed 8 years of school. Although he took an English as a Second Language course at CPCC in the early 1980s, Plaintiff did not complete the classes, electing instead to work to support his family.
2. Plaintiff reads and writes English at approximately a third grade level, and speaks English at approximately a seventh grade level. He is familiar with the vocabulary used to describe his work, but even in that context he has difficulty comprehending and clearly communicating in English.
3. Plaintiff started to work for Defendant-Employer, a fiber paper drum manufacturer, on March 9, 1987, and continued to work there for 20 years. Plaintiff received several accolades from Defendant-Employer for work performance and good attendance.
4. Plaintiff's official job title was "sheeter operator." A sheeter operator works on machines that cut sheets of paper to send to a winder machine, which assembles fiber paper drums. Although his official job title was sheeter operator, Plaintiff's actual work responsibilities included tasks associated with several different second shift job titles. The second shift positions involved different duties than the comparable first shift positions. These additional duties included helping to feed and unload the winder machines, driving a forklift, and performing other duties associated with the drum manufacturing process. *Page 5 
5. Plaintiff was required to fill multiple orders for several hundred fiber drums each work shift. After using the sheeter machine, Plaintiff had to assist another operator in feeding paper into the winder machine and unloading it. Plaintiff's job duties required him to lift stacks of paper weighing between twenty-five and thirty pounds at shoulder level or above in order to feed them into the winder.
6. Notwithstanding his limited command of the English language, Plaintiff demonstrated the arm motions involved in his job duties at the hearing. These motions involved overhead or above-the-shoulder use of his left arm, which put more than intermittent pressure on his left shoulder. Plaintiff is five feet, six inches tall, making him shorter than a winder machine. As a result, Plaintiff had to feed paper into the winder machine above his shoulder level.
7. Plaintiff also used his left arm in an overhead or over-the-shoulder fashion when unloading the fiber drums or cylinders once they were completed. Plaintiff used his right hand to push the cylinders, while his left hand and arm picked them up over shoulder level to put them on a conveyor.
8. Plaintiff used his left arm in an overhead fashion or at angles of 90 degrees or more for at least three hours of an eight-hour work shift.
9. Bill McClure, an ergonomist, testified for Defendants. His opinions were restricted to risk factors for the development of shoulder problems only and did not address medical causation or diagnosis.
10. Mr. McClure's opinion that there was a lack of increased risk to Plaintiff was based purely on his evaluation of jobs presented to him by Defendant-Employer during his visit to Defendant-Employer's facility, which did not include working on the winder machine. Mr. McClure performed his evaluation during the first shift, while Plaintiff worked the second shift. *Page 6 
Furthermore, Mr. McClure never saw Plaintiff perform his job, and he did not review Plaintiff's testimony taken at the hearing in arriving at his conclusions. Mr. McClure testified that his opinion might be changed by seeing a different set of work tasks, and that his opinion would change if he were shown tasks which exceeded the parameters involving the use of arms overhead or at angles exceeding 90 degrees.
11. There was a material difference between the information Mr. McClure relied on in reaching his conclusions and Plaintiff's description of his job as involving significant overhead lifting and reaching. The Full Commission gives greater weight to Plaintiff's description of the manner in which he performed his job.
12. Plaintiff started developing left shoulder pain in approximately June 2006. Plaintiff reported his shoulder pain to his supervisor, Jim Bridges, who did not offer him any assistance, and to another employee named John Grant. After informing these individuals of his shoulder pain, Plaintiff continued to work in his usual job and did not see a physician until February 2007.
13. On February 28, 2007, Plaintiff was seen by Cliff Kramer, a physician's assistant at OrthoCarolina. Mr. Kramer associated Plaintiff's shoulder pain with his "work as a machine operator and . . . doing a lot of heavy lifting overhead." Plaintiff's therapists also made this association in subsequent visits. Mr. Kramer took plaintiff out of work on February 28, 2007.
14. Because Plaintiff did not report a specific accident or injury to Mr. Kramer, Plaintiff's providers at OrthoCarolina did not indicate a relationship between Plaintiff's work activities and his shoulder pathology. *Page 7 
15. Throughout his treatment Plaintiff exhibited a positive impingement sign indicative of bursal impingement and inflammation, or "bursitis." An MRI of Plaintiff's left shoulder performed on March 21, 2007 also indicated a diagnosis of bursitis.
16. In addition to bursitis, Plaintiff's shoulder condition consisted of a torn rotator cuff and other pathology that is consistent with "wear and tear" or an overuse of the shoulder. 17. Dr. Michael Dockery performed surgery on Plaintiff's left shoulder on May 11, 2007 at which time he noted moderate impingement change in the bursa and an obvious rotator cuff tear. Dr. Dockery opined that bursitis is inseparable from rotator cuff pathology and the other diagnoses relating to Plaintiff's shoulder. The surgery involved a rotator cuff repair, a debridement of the superior labrum, a subacromial decompression with acromioplasty and CA ligament resection, and a bursectomy. The purpose of a bursectomy was to remove an abnormal bursa and to reduce inflammation in the bursa. The risks associated with the bursectomy include additional surgery and adhesive capsulitis, or "frozen shoulder," which is characterized by joint stiffness and loss of motion.
18. Plaintiff initially improved after the surgery, but eventually developed worsening pain, limited range of motion, and increased sleep disturbance because of his left shoulder. Plaintiff also developed adhesive capsulitis.
19. On October 30, 2007, Dr. Dockery released Plaintiff with permanent restrictions of no lifting greater than 10 pounds at any angle, no pushing or pulling with the left arm greater than 10 pounds at any angle, and no lifting at all above shoulder level. Defendant-Employer was unable to accommodate these restrictions
20. Plaintiff stopped treating with Dr. Dockery, who had recommended another surgery for Plaintiff's shoulder, and instead saw Dr. Jerry Barron, another orthopedic surgeon, *Page 8 
for additional care for his shoulder. On April 17, 2008, Dr. Barron noted significant abnormalities during a physical examination of Plaintiff's left shoulder which were consistent with adhesive capsulitis. He also recommended an arthroscopic evaluation and a possible debridement and capsular release of the shoulder. Plaintiff had not had this surgery as of the time of the hearing before the Deputy Commissioner.
21. Dr. Dockery opined that individuals who perform "a lot of overhead work and/or lifting repetitively" are more prone to develop rotator cuff, bursa and even cartilage problems and indicated that such risk factors are substantiated by medical literature.
22. Plaintiff did not believe that he could file a workers' compensation claim in the absence of an "accident" or specific "injury." His daughter completed an application for short-term disability benefits which Plaintiff did not fully understand, and which asked specifically whether an accident or a specific injury had occurred. In response to these inquiries, Plaintiff's daughter wrote that Plaintiff was not hurt at work. The forms did not ask whether Plaintiff had an occupational disease as the result of his work activities.
23. The medical evidence shows that Plaintiff's doctors never told him that he had "bursitis" specifically, and that Plaintiff was not advised by competent medical authority that he had a work-related condition resulting from "wear and tear" or "overuse" of his left arm until after he had filed the Form 18 relating to this claim on April 4, 2008.
24. Since October 30, 2007, Plaintiff has continued to have pain and significant limitations because of his left shoulder condition.
25. The greater weight of the evidence shows that Plaintiff's overhead reaching and lifting at work placed Plaintiff at an increased risk of developing his shoulder problems, which *Page 9 
include rotator cuff pathology and bursitis, among other wear-and-tear or degenerative diagnoses that were confirmed by clinical examination, diagnostic testing, or during surgery.
26. The greater weight of the evidence shows that Plaintiff's left shoulder condition more likely than not developed insidiously, gradually, and over time as "wear and tear" from his overhead lifting activities at work.
27. The greater weight of the evidence shows that Plaintiff's job activities more likely than not caused and significantly contributed to the development of his left shoulder condition.
28. The greater weight of the evidence shows that Plaintiff was medically unable to work beginning on March 1, 2007 and continuing through October 30, 2007.
29. Plaintiff is capable of "some" work within the permanent restrictions assigned by Dr. Dockery on October 30, 2007. However, it would be futile for him to seek alternative work, in light of his advanced age, his limited education, including his limited ability to speak, write, and read English, his medical limitations, and his lack of transferable work skills.
30. Plaintiff required a translator during the hearing and for his medical appointments.
 * * * * * * * * * * *
Based on the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff's left shoulder condition is compensable as an occupational disease. This condition includes, but is not limited to, his rotator cuff pathology, labral pathology, and bursitis. N.C. Gen. Stat. § 97-53.
2. Even though the issue of increased risk is technically not germane to bursitis under N.C. Gen. Stat. § 97-53(17), James v.Perdue Farms, Inc., 160 N.C. App. 560, 586 S.E.2d 557 (2003), *Page 10 
Plaintiff's job activities placed him at an increased risk for developing all diagnoses in his left shoulder, Rutledge v.Tultex Corp., 308 N.C. 85, 301 S.E.2d 359 (1983), which are otherwise compensable under N.C. Gen. Stat. § 97-53(13).
3. Plaintiff's job activities caused and significantly contributed to the development of his left shoulder condition. Booker v. DukeMed. Ctr., 297 N.C. 458, 256 S.E.2d 189 (1979).
4. Plaintiff has been totally disabled from March 1, 2007, through the present time and continuing. N.C. Gen. Stat. §§ 97-2(9), 97-29.
5. Plaintiff's job activities for Defendant-Employer represented the last injurious exposure for his development of the left shoulder pathology for which Defendants are liable. N.C. Gen. Stat. § 97-57.
6. Plaintiff is not estopped from asserting this workers' compensation claim based on the representations made in the short-term disability application documents. N.C. Gen. Stat. § 97-6. Plaintiff reported his shoulder pain to his supervisor, Jim Bridges. Also, the facts that Plaintiff does not understand English very well, and that his daughters filled out the forms, which asked only about accidents and specific injuries and not about occupational diseases, further militate against the application of estoppel in this case.
7. Plaintiff is entitled to have Defendants pay for all medical treatment reasonably related to Plaintiff's left shoulder condition, and Dr. Jerry Barron is designated as Plaintiff's authorized treating physician. N.C. Gen. Stat. §§ 97-25, 97-25.1.
8. Defendants are entitled to a credit in the amount of $4,731.83 for short-term disability benefits paid for the 12 weeks prior to August 3, 2007 against the amount of total disability owed to Plaintiff during this period. N.C. Gen. Stat. § 97-42.
 * * * * * * * * * * * *Page 11 
Based on the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall authorize and pay for all medical treatment related to Plaintiff's left shoulder condition and Dr. Jerry Barron is designated as Plaintiff's authorized treating physician.
2. Defendants shall pay compensation to Plaintiff for his total disability at the weekly rate of $692.20 from March 1, 2007 through the present time and continuing until further Order of the Commission, subject to an attorney's fee set forth below. Defendants are entitled to a credit in the amount of $4,731.83 for the twelve-week period preceding August 3, 2007.
3. Defendants shall pay the interpreter's fee for the hearing. N.C.I.C. Rule 616.
4. Plaintiff's counsel is entitled to a reasonable attorneys' fee in the amount of 25% of all compensation awarded Plaintiff in this Opinion and Award. Defendants shall pay Plaintiff's counsel 25% of any lump sum due Plaintiff and every fourth check thereafter until further Order of the Commission.
5. Defendants shall pay the court costs.
This the 8th day of April, 2010.
 S/___________________ DIANNE C. SELLERS COMMISSIONER
 CONCURRING: *Page 12 
S/___________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1